**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0978-18T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHRISTOPH WITTER, a/k/a
CHRISTOPHER WITTER,

     Defendant-Appellant.

_____

          Submitted September 9, 2019 – Decided September 17, 2019

          Before Judges Fasciale and Moynihan.

          On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-01-0070.

          Joseph E. Krakora, Public Defender, attorney for appellant (Peter Thomas Blum, Assistant Deputy Public Defender, of counsel and on the brief).

          Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Stephen Christopher Sayer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After pleading guilty to third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(b)(3), defendant appeals, pursuant to Rule 3:5-7(d), from the trial court's denial of his motion to suppress thirty-one folds of heroin found on his person and fifty folds of heroin – thirty-two of which bore the same stamp as those found on his person – found in a hotel room for which State police found the key on his person after he was searched incident to his arrest. He argues:

> THE FRUITS OF WITTER'S UNLAWFUL ARREST SHOULD HAVE BEEN SUPPRESSED BECAUSE THE APPARENT DRUG SALE BY WITTER'S COMPANION DID NOT GIVE THE POLICE PROBABLE CAUSE TO ARREST WITTER. U.S. CONST. AMENDS. IV, XIV; N.J. CONST. ART. I, [¶] 7.

We agree, reverse and remand.

Except for legal conclusions of which we conduct a plenary review, State v. Goodman, 415 N.J. Super. 210, 225 (App. Div. 2010), our review of a trial judge's decision on a suppression motion is deferential, State v. Robinson, 200 N.J. 1, 15 (2009). We "uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007). Because the motion

2

judge observes the character and demeanor of the witnesses at a suppression evidentiary hearing, he or she is better positioned to determine credibility. State v. Locurto, 157 N.J. 463, 474 (1999).

From the motion judge's findings following an evidentiary hearing we glean these facts. Members of a New Jersey State Police unit assigned to investigate street-level gun and drug crimes in the City of Millville set up surveillance at a motel known for drug-distribution activities. Four men in a Honda parked and did not exit the vehicle until a pickup truck parked next to the Honda. One of the men, later identified as Detrell Hubert, exited the passenger side of the Honda, entered the pickup truck and engaged in what one of the troopers believed, based on his training and experience, to be a hand-to-hand drug transaction. The trooper determined there was sufficient probable cause to arrest Hubert who had reentered the Honda.

As the trooper approached the Honda, Hubert exited the vehicle and ran. Although the motion judge did not specify if defendant was inside or outside the Honda when the trooper approached, at some point defendant began to walk away from the vehicle in the direction opposite from that which Hubert took.[1]

---

[1] Although the trooper testified that defendant walked in the same direction as Hubert ran and that his report—which indicated defendant walked in the

The motion judge found the other two men "acted like nothing was wrong" and remained in the Honda.

The trooper thought he had probable cause to arrest defendant, and a search incident to his ultimate arrest yielded heroin and a motel room key. Thus our initial attention focuses on whether the trooper's probable-cause determination was correct, a question that

> "turn[s] upon whether, at the moment the arrest was made, the officers had probable cause to make it – whether at that moment the facts and circumstances within their knowledge . . . were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."
>
> [State v. Contursi, 44 N.J. 422, 429 (1965) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).]

That is, did the trooper have "a well[-]grounded suspicion or belief on the part of the searching or arresting officer that a crime [was] committed" by defendant. State v. Guerrero, 232 N.J. Super. 507, 511 (App. Div. 1989).

The motion judge, in concluding the trooper had probable cause to arrest defendant, credited the trooper's testimony about his "significant on[-]the[-]job

---

opposite direction—was mistaken, the motion judge found defendant walked in the opposite direction.

experience and knowledge of how drug sets operate," and summarized the trooper's explanation for defendant's arrest:

> In the distribution of narcotics, frequently each individual will have a certain role to fulfill. One will hold the drugs. One will hold the currency. The final will distribute the drugs. The reasoning is that if the distributor is caught, he cannot be charged with other crimes. Thus, the [t]rooper was faced with a car of four men that did not get out to go to a hotel room, the visual observation of a suspected narcotics transaction, his knowledge of how drug sets operate and the attempted flight by two of the four individuals in the car led him to believe that . . . defendant was likewise involved in the distribution. The [t]rooper indicated that it was the totality of the circumstances that led him to arrest . . . defendant.

Nothing observed by or known to the trooper, however, established probable cause to arrest defendant. The trooper did not observe any interaction between defendant and Hubert to link defendant to the latter's drug distribution. There is no evidence of an exchange of money. There is no evidence of an exchange of drugs. There is no evidence defendant ever spoke to Hubert before or after the observed drug transaction. Indeed, the only difference between defendant and the two men who remained in the Honda—and were not arrested—was that defendant walked away. Thus, although we fully appreciate that a "narcotics officer is especially qualified to detect traffic in narcotic drugs [and] learns through experience how to spot an addict or pusher, how an addict

5

or pusher acts and reacts," State v. Sheffield, 62 N.J. 441, 445 (1973), the trooper's knowledge about drug sets had no application to the circumstances that he perceived in this case.

Although we have authorized the search of all persons connected to a location where a search warrant was being executed, In re L.Q., 236 N.J. Super. 464, 473 (App. Div. 1989)—arguably analogous because the "standards for determining probable cause to arrest and probable cause to search are identical," State v. Moore, 181 N.J. 40, 45 (2004)—the circumstances here are markedly different. In L.Q., the warrant application indicated: a reliable confidential source reported ongoing cocaine sales from a residence, 236 N.J. Super. at 466; sporadic surveillance of the home was conducted and individuals were observed coming and going from the house; and a controlled cocaine purchase was made at the house. Id. at 467. We held a warrant

> may authorize the search of all persons already present or arriving [at the location] if the search is conducted at a time when sales ordinarily take place, if the premises are not of a sort likely . . . frequented by the public for lawful purposes, and if . . . a person who is [on] the premises when the police enter or who arrives there during the search is likely . . . a party to the unlawful activity.
>
> [Id. at 472.]

Here, the trooper did not observe any drug activity in the Honda prior to the transaction in the pickup truck. No evidence established that the occupants of the Honda were part of Hubert's illegal activity. As the Court noted in State v. Sims, 75 N.J. 337, 349 (1978), "even presence in an automobile as a passenger will not necessarily implicate one in the illegal acts of the driver"; the same could be true if the illegal activity was conducted by another passenger, particularly if the activity did not take place in the vehicle, see generally State v. Shipp, 216 N.J. Super. 662, 665, 666 (App. Div. 1987) (recognizing the "'general proposition[]' [that] criminal possession [of illegal substances] may not be inferred from [a] defendant's mere presence at the location where the contraband was found" and determining that "[m]ere knowledge, without more, on the part of one automobile passenger that a co-passenger is carrying illicit drugs does not constitute the former [as] a co-possessor").

We are left to consider what the motion judge described as defendant's "flight" from the Honda in determining whether there was probable cause to arrest. We first observe that, unlike Hubert, defendant was not indicted for resisting arrest, N.J.S.A. 2C:29-2(a)(2); nor was he indicted for any other charge in connection with his "flight," e.g. obstruction, N.J.S.A. 2C:29-1(a). Moreover, there is no evidence that any law enforcement officer issued to defendant a

7

command to stop or that defendant ignored any such command so as to give rise to probable cause to arrest defendant. See State v. Crawley, 187 N.J. 440, 451-52 (2006). Further, defendant was not known to the trooper; nor did he act in a manner to give rise to probable cause as he walked from the Honda. See Sheffield, 62 N.J. at 445-46 (holding probable cause to arrest arose when the defendant, who was known to the narcotics detective to be a drug dealer and was seen in a narcotics area where the detective had seen him "on some 40 prior occasions," placed heroin in his mouth as he was "walking rapidly away" from the detective who had called the defendant over to speak to him).

Under the totality of the circumstances, the trooper would have been justified in stopping defendant, considering: defendant's presence in a high crime area, State v. Piniero, 181 N.J. 13, 24 (2004); the trooper's training and experience, id. at 22; defendant's departure from the scene as police moved in, State v. Citarella, 154 N.J. 272, 276, 290 (1998); State v. Tucker, 136 N.J. 158, 168-69 (1994); and the trooper's observations of Hubert, all of which were "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity.'" State v. Nishina, 175 N.J. 502, 510-11 (2003) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). But more is needed to establish probable cause: the "well-

8

grounded suspicion that a crime has been or is being committed." Moore, 181 N.J. at 45 (quoting Nishina, 175 N.J. at 515).

In Piniero, the Court ruled that probable cause was not established by evidence that a police officer observed defendant give his codefendant a pack of cigarettes; based on the officer's experience, he knew that drugs were sometimes carried in cigarette packs; the officer "was familiar with defendant from having 'cleared him off the corners' in the same area" where he was observed and had received reports that identified defendant as a drug dealer; the officer had previously arrested the codefendant and knew of his drug involvement; and both defendant and codefendant "immediately departed the area upon seeing" the officer, although neither ran or refused a police order to stop. 181 N.J. at 25-26, 28. The Court concluded:

> Here . . . there was no observation of currency or anything else exchanged, rather, there was merely a transfer of a cigarette pack under circumstances that had both innocent and suspected criminal connotations. Moreover, there was no proof of "regularized police experience that objects such as [hard cigarette packs] are the probable containers of drugs." State v. Demeter, 124 N.J. 374, 385-86 (1991). The sum of the evidence was merely the officer's prior general narcotics training and experience, and his conclusory testimony that he knew that cigarette packs are used to transport drugs because he had seen that type of activity before.
>
> [Id. at 28.]

Here, the trooper observed even less questionable activity by defendant. As such, we cannot conclude there was probable cause for defendant's arrest and the seizure of the heroin and the motel key must be suppressed. State v. Barry, 86 N.J. 80, 87 (1981); State v. Dolly, 255 N.J. Super. 278, 286 (App. Div. 1991).

As to the drugs found in the motel room, defendant briefly argues, citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963): "Because the discovery of the [motel room] key directly caused the officer to go to [that motel] room, the items found there, including the additional heroin, were "fruit of the poisonous tree" and should have been suppressed. The State did not address the seizure from the motel room in its merits brief.

"Three factors determine whether subsequently obtained evidence is tainted by a prior illegality: (1) the presence of intervening circumstances between the original illegality and the challenged evidence; (2) the temporal proximity between the original illegality and the challenged evidence; and (3) the flagrancy and purpose of the police misconduct." State v. Smith, 155 N.J. 83, 100-01 (1998). The trooper proceeded to the room ten minutes after seizing the key from defendant. As the motion judge found, "the trooper candidly admitted that they initially went to the window of the room because there may be additional contraband located" in the room. We discern no intervening

circumstance between the seizure of the key and the trooper's travel to the room ten minutes after the key was seized following defendant's arrest. We also see no evidence that anything besides the key led police to the room. As such, under the tri-partite taint test, we determine the evidence seized from the room was fruit of the seizure that followed defendant's unlawful arrest.[2]

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] We are unpersuaded by the motion judge's analysis that the search of the room was justified by the emergency aid exception and the plain view doctrine after the trooper peered through the room window and saw an unresponsive woman lying on the bed next to a box of heroin folds. Notwithstanding a potential medical emergency, there is no evidence the trooper would have found the room if the key had not been seized from defendant and without the key, the trooper would not have been in a position to see the woman through the window.

A-0978-18T1